**Nancy ARMIJO, as personal representative of the Estate of Luz Armijo, deceased, Plaintiff,**

v.

**The ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, a Delaware Corporation, Defendant.**

No. CIV 89–293 SC.

United States District Court,
D. New Mexico.

Nov. 16, 1990.

---

Chris Key, Albuquerque, N.M., for Armijo.

Katherine C. Pearson, Sorenson and Schutte, P.C., John S. Thal, Modrall Sperling Harris and Sisk, PC, Albuquerque, N.M., for AT & SF Ry. Co.

## MEMORANDUM OPINION AND ORDER

CAMPOS, District Judge.

This matter is before the Court on:

1. Defendant's Motion for Partial Summary Judgment,

2. Plaintiff's Motion in Limine Regarding Seat Belt Defense, and

3. Defendant's Motion to Exclude Conclusory Testimony of Plaintiff's Expert that Crossing was Extrahazardous.

The Court, having read the memoranda submitted by the parties, having examined the exhibits attached thereto and being apprised of the applicable law, reaches the following decisions for the reasons set forth below.

This is an action for wrongful death. On October 23, 1987, the Defendant operated a railroad train on its railway line through the North Gabaldon crossing in Belen, New Mexico, where a collision occurred between the train and a motor vehicle driven by Luz Armijo, the Plaintiff's Decedent. Plaintiff claims the death of Luz Armijo was the proximate result of the Defendant's negligent failure to provide adequate warnings at the crossing and Defendant's negligent operation of its train. Defendant claims that Armijo's death was the proximate result of his own negligence and that it was not negligent in any manner in operating the train on the night of the accident. Defendant further claims that any state common law theory of negligence based on Defendant's duty to install warning devices at railroad crossings has been preempted by federal laws and regulations. This last contention is the subject of Defendant's motion for partial summary judgment which the Court will address first.

## I. Defendant's Motion for Partial Summary Judgment

Defendant moves the Court for an order granting it partial summary judgment with respect to the Plaintiff's claims that Defendant had a duty to install additional warning devices at the railroad crossing at issue in this case. As grounds therefore, Defendant states that any state common law theory of negligence on the part of Defendant with regard to the installation of warning devices at railroad crossings has been preempted by federal laws and regulations. Plaintiff makes numerous arguments against preemption.

The following facts were submitted by Defendant in its Motion for Partial Summary Judgment as undisputed material facts. According to 56.1 b. of the Rules of the United States District Court for the District of New Mexico, all material facts set forth in the statement of the movant shall be deemed admitted unless specifically controverted. Plaintiff in her Response Brief did not dispute any of Defendant's undisputed material facts. Therefore, the Court will consider admitted the following material facts.

In 1970, the United States Congress enacted the Federal Railroad Safety Act (FRSA) which expressly preempted state law as to the subject matter of any order, standard, or regulation relating to railroad safety issued by the Secretary of Transportation. 45 U.S.C. §§ 421–444. A specific section of the FRSA was devoted to railroad-highway grade crossing safety and required the Secretary of Transportation to report to Congress on procedures to be employed to develop safer grade crossings. 45 U.S.C. § 433(a). In 1973, after the Secretary of Transportation filed his report with Congress, Congress amended the Federal Highway Safety Act to require the states to "conduct and systematically maintain" a list of railroad crossings requiring improved protective or warning devices. 23 U.S.C. § 130(d). In addition, the states were required to "implement a schedule" for the construction and installation of improved railroad crossing protective devices. Id.

In 1983, pursuant to regulations promulgated by the Secretary of Transportation, the Federal Highway Administration

adopted and approved the Manual on Uniform Traffic Control Devices (MUTCD) as the national standard for all traffic control devices. 23 C.F.R. § 655.603 (1990). Consistent with federal regulations, New Mexico adopted the MUTCD as the standard for traffic control devices in New Mexico. N.M.Stat.Ann. § 66–7–101 (Repl.1987). The MUTCD provides that "the determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority." MUTCD, Part VIII at 8A–1. Furthermore, in 1975, the Secretary promulgated regulations mandating that "state laws requiring railroads to share in the cost of work for the elimination of hazards at railroad-highway crossings shall not apply to Federal-aid projects." 23 C.F.R. § 646.210(a) (1990). The Secretary of Transportation determined that "projects for grade crossing improvements are deemed to be of no ascertainable net benefit to the railroads and there shall be no required share of the costs." 23 C.F.R. § 646.210(b)(1) (1990).

Pursuant to the provisions of the Highway Safety Act, in 1984 the State of New Mexico obtained a list of all railroad-highway grade crossings in the State, prepared by the federal Department of Transportation with input from the American Association of Railroads (hereinafter the DOT–AAR inventory), which listed all public railroad crossings in New Mexico based on the likelihood of an accident occurring at a particular crossing during a given year. Cisneros Deposition, p. 10.[1] In 1984, the North Gabaldon Road crossing was number 197 on the DOT–AAR inventory containing a total number of 900 public railroad-highway crossings located in New Mexico. Cisneros Deposition, Ex. 1. Having obtained the DOT–AAR inventory, the New Mexico State Highway Department (through the Railroad & Utilities Section), with federal assistance, prioritized and ranked the railroad crossings for warning device upgrading based on a number of factors calculated by the State. Cisneros

Deposition, pp. 9, 10, 30. In July, 1984, the Railroads & Utilities Section completed its statewide study of the 900 railroad crossings listed in the DOT–AAR inventory. Cisneros Deposition, Ex. 2, p. 25. Also, in July, 1984, the Railroad & Utilities Section narrowed the DOT–AAR Inventory to a list of 22 (later amended to 27) projects that the Section concluded should be considered for Federal–Aid Safety Funding. Id. at 26–30. On July 27, 1984, the Railroad & Utilities Section diagnostic team submitted its list of the 22 projects to be submitted for approval by the Federal Highway Administration for federal railroad safety project funding. Id. at 25. The July, 1984 evaluation prepared by the Railroad & Utilities Section ranked the North Gabaldon Road crossing with a priority number of 14 and included the crossing in its 5 year plan. Id. at 27–30. This report included the specific evaluation that the type of warning device to be installed at the North Gabaldon Road railroad crossing was "flashers and gates." Id. at 29.

When the Railroad & Utilities Section determines that a particular railroad crossing is, by virtue of its ranking, the next to have its warning devices upgraded, it first informs the Federal Highway Administration and then informs the railroad (through a railroad representative on the diagnostic team) of that determination and requests a preliminary engineering report and construction cost estimate for installing the additional warning signals. Cisneros Deposition, p. 30; San Miguel Affidavit, ¶ 6.[2] Requests for an engineering report are made by the Railroad & Utilities Section to the railroad-employee member of the diagnostic team to provide engineering advice in terms of railroad operations as to the installation of additional warning devices at particular railroad crossings. Cisneros Deposition, p. 30; San Miguel Affidavit, ¶¶ 5, 6; 23 C.F.R. § 646.204(g) (1990); 23 C.F.R. § 646.216(b)(i) (1990). As of October 23, 1987 (the date of the accident) the State of New Mexico had not requested a

---

1. Lester Cisneros is the section head of the Railroad & Utilities Section of the New Mexico State Highway and Transportation Department.

2. Rudy San Miguel is an AT & SF employee and was a member of the State diagnostic team in 1987.

preliminary engineering report concerning upgrading the warning devices at the North Gabaldon Road crossing. San Miguel Affidavit, ¶ 6.

The State of New Mexico receives federal funding to upgrade warning devices at railroad crossings and presently upgrades about ten railroad crossings per year. Cisneros Deposition, p. 10. As of September 30, 1987, the Railroad & Utilities Section had completed seven of the 22 projects listed on the July, 1984 evaluation. Cisneros Deposition, Ex. 2, p. 20. One factor considered by the Railroad & Utilities Section in ranking and prioritizing railroad crossings for the upgrading of warning devices is whether previous collisions have occurred at a particular crossing. Cisneros Deposition, p. 13. Prior to October, 1987, there were no accidents at the North Gabaldon Road crossing. Cisneros Deposition, Ex. 1. In November 1987, following the accident, Mr. San Miguel was contacted by the State Railroad & Utilities Section. San Miguel Affidavit, ¶ 6. The Section requested that Defendant perform the preliminary engineering and prepare a construction cost estimate for upgrading the warning devices at the North Gabaldon Road crossing. Id.

A motion for summary judgment properly may be granted only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Houston v. National General Insurance Co.*, 817 F.2d 83 (10th Cir.1987). Here, there appear to be no disputed facts. The issue before the Court is strictly a legal question. The issue is whether Plaintiff's claims that Defendant was negligent in failing to install additional warning devices at the North Gabaldon Road crossing are preempted by federal law.

State law is preempted under the Supremacy Clause of the United States Constitution, Art. VI, cl. 2, in three circumstances. *English v. General Electric Company*, —— U.S. ——, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). "First, Congress can define explicitly the extent to which its enactments pre-empt state law." Id. This is the situation presently before the Court.[3] Congress included in the FRSA a broad preemption provision excluding the states from legislating in any area of railroad safety already covered by regulations adopted by the Secretary. *CSX Transportation, Inc. v. Public Utilities Commission of Ohio*, 701 F.Supp. 608, 609 (S.D. Ohio 1988), aff'd, 901 F.2d 497 (6th Cir. 1990). Section 434 reads:

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety *until such time* as the Secretary has adopted a rule, regulation, order or standard covering the subject matter of such State requirement. A state may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce (emphasis added).

[1] The scope of preemption under the FRSA has been broadly construed by the courts. *CSX Transportation* at 612–613 citing numerous cases. Section 434 expressly declares that a primary objective of the Act is the establishment of a nationally uniform system of regulation in the rail safety field. Thus, state adopted regulations, with the exception of those designated to eliminate an essentially local safety hazard, are permitted to continue in force only until such time as a federal regulation

---

**3.** The other two circumstances where state law is preempted are: 1) where state law is in a field that Congress intended the federal government occupy exclusively and 2) where a state law actually conflicts with a federal law. *English, supra.*

covering the same subject matter is promulgated. *National Association of Regulatory Utility Commissioners v. Coleman,* 542 F.2d 11, 13 (3rd Cir.1976). The FRSA does not merely preempt those state laws which impair or are inconsistent with federal regulations. *Burlington Northern Railroad Company v. State of Montana,* 880 F.2d 1104, 1106 (9th Cir.1989). It preempts all state regulations aimed at the same safety concerns addressed by federal regulations. Id.

■ Therefore, if the Secretary acts with regard to the same subject matter as a state law, rule, regulation, order, or standard, unless the state law addresses an essentially local safety hazard, the state law is preempted. Several courts have dealt with the issue of whether federal regulations promulgated by the Secretary (as set forth in the undisputed material facts) have preempted state laws in the area of improvements at railroad-highway crossings. For example, the Federal District Court for the District of Kansas stated:

> [I]n the 1970's, Congress, recognizing a need for uniform safety standards, enacted the Railroad Safety Act which imposed nationwide standards, reserving authority to the states for further regulation only under special circumstances. In conjunction with the national regulation of railroad safety, Congress determined that grade crossing improvements were a governmental responsibility rather than the responsibility of the railroads and increased funding to the federal aid program.

*Sisk v. National Railroad Passenger Corp.,* 647 F.Supp. 861, 863 (D.Kan.1986).

■ This Court is in agreement with those courts that have found that the federal regulations in this area have preempted state law. It is this Court's conclusion, that the Secretary has acted with regard to the installation of warning devices at railroad-highway crossings. The Secretary acted in this area with the promulgation of the procedures outlined in 23 C.F.R. § 646.200 *et seq.* and with the adoption of the MUTCD as the national standard. The

MUTCD specifically states that "the determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority." MUTCD, Part VIII at 8A–1. "Subject to such determination and selection, the design, installation and operation shall be in accordance with the national standards contained herein." Id. By adopting this standard, the Secretary has effectively preempted any state law covering the same subject matter. The New Mexico law cited to this Court by Plaintiff predates the Secretary's action and addresses precisely the subject matter addressed by the MUTCD, that is, what entity is responsible for determining the need and selection of devices at railroad-highway crossings. As stated previously, the FRSA preempts all state regulations aimed at the same safety concerns addressed by the Secretary's regulations. *Burlington Northern Railroad Company v. State of Montana,* 880 F.2d 1104, 1106 (9th Cir.1989). Therefore, the Court finds that any New Mexico state common law or statutory law placing the duty of determining the need for and the selection of appropriate warning devices at railroad-highway crossings on the railroad is preempted by federal law. Federal law delegates to the public agency having jurisdictional authority, and not to the railroad, the responsibility and the authority for determining the need for and the selection of appropriate railroad-highway grade crossing signals.

■ While this Court believes that state law was preempted when the Secretary passed regulations dealing with the subject matter of warning devices at railroad-highway grade crossings as discussed above, the Court alternatively finds, that at the very least, under the rationale of *Marshall v. Burlington Northern, Inc.,* 720 F.2d 1149 (9th Cir.1983) the present negligence claim was entirely preempted as of July, 1984. Only two federal appellate courts have considered the question of whether federal grade crossing regulations preempt state law claims against railroads predicated upon negligence in selecting or providing additional warning devices. The Ninth Circuit in *Marshall* held that preemption

occurs when the state authorities approve the level of protection at a crossing, whereas the Eighth Circuit in *Karl v. Burlington Northern Railroad Co.,* 880 F.2d 68, 76 (8th Cir.1989) ruled there was no preemption. The Ninth Circuit in *Marshall* stated:

> The Secretary, through the Federal Highway Administration, prescribed procedures to obtain uniformity in highway traffic control devices and adopted the Manual on Uniform Traffic Control Devices on Streets and Highways, *see* 23 C.F.R. § 655.601 (1981), which also was adopted by Montana, *see* Mont.Code Ann. § 61–8–202 (1981). The manual prescribes that the selection of devices at grade crossings and the approval for federal funds is to be made by local agencies with jurisdiction over the crossing. Thus, the Secretary has delegated federal authority to regulate grade crossings to local agencies.

*Marshall* at 1154.

The *Marshall* Court found that the FRSA preempts a state negligence claim when the responsible state agency has made a determination regarding the type of warning device to be installed at a crossing. Id. Therefore, the *Marshall* Court held that until a federal decision is reached through the local agency on the adequacy of the warning device at a particular crossing, the railroad's duty under applicable state law is not preempted. Id. If this Court follows the reasoning of the Ninth Circuit, the federal decision in this case was made in 1984 when the State of New Mexico Railroad & Utilities Section made the determination, under the MUTCD, as to the type of warning devices to be installed at the North Gabaldon Road crossing. So, at the very least, under the *Marshall* rationale, the present negligence claim was entirely preempted as of July, 1984.[4]

Thus, the Court finds that the Secretary has acted in this case and state law is preempted. However, § 205 of the FRSA has a savings clause under which states are permitted to adopt regulations to eliminate essentially local safety hazards, even if the Secretary has acted in a particular area of railroad safety. This section reads:

> A state may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

45 U.S.C. § 434.

■ Plaintiff argues that the North Gabaldon Road crossing in question is an "essentially local safety hazard." The Court does not agree. This savings clause was designed to enable states to respond to local situations which are not statewide in character and not capable of being adequately encompassed within uniform national standards. *National Association of Regulatory Utilities Commissioners v. Coleman,* 542 F.2d 11, 14–15 (3d Cir.1976). The exception in § 434 was not intended "to permit a State to establish Statewide standards superimposed on national standards covering the same subject matter."

---

**4.** The Court does not find the Eight Circuit's decision in *Karl* to be persuasive. The *Karl* Court did not discuss the express preemption provision in 45 U.S.C. § 434. Rather, it focused on generally how state laws may be preempted if they actually conflict with an express or implied federal declaration, or if the state law is in a field that is so pervasively controlled by federal law that no room is left for state rulemaking. *Karl* at 76. The *Karl* Court found that neither circumstance was present in that case. Id. However, the *Karl* decision ignores the first circumstance (as discussed by the Supreme Court in *English, supra*) where state law is preempted, namely, when Congress defines explicitly the extent to which its enactment preempts state law. As explained in the body of this opinion, Congress explicitly defined the extent to which its enactment would preempt state law in § 205 of the FRSA. In light of the express provision in § 434, there is no need to determine whether state law in this case actually conflicts with the federal law or whether state law is preempted because it is in a field that Congress intended the federal government to occupy exclusively. The Court notes, however, that state law placing the duty to determine the need for and selection of warning devices at railroad-highway crossings on the railroad is in direct conflict with the MUTCD which places this duty on the public agency with jurisdictional authority.

H.R.Rep. No. 91–1194, reprinted in 1970 U.S.Code Cong. & Admin.News, 4104, 4116–4117. Plaintiff is asking this Court to find that the statewide common law duty of railroads to maintain a good and sufficient crossing falls within the local safety hazard exception of § 434. However, based on the legislative history of § 434, it is clear to the Court that statewide laws, such as the tort duty advanced by Plaintiff in this case, would not constitute a law relating to a "local safety hazard." Plaintiff is attempting to do exactly what the House Report specifically states that there is no intent to permit, namely, establishing a statewide standard (a statewide common law duty) "superimposed on national standards covering the same subject matter." The Court finds that the statewide system of tort law imposing a duty on a railroad to determine the need for, select and install warning devices at railroad-highway crossings does not constitute a law relating to a "local safety hazard."

The Plaintiff next argues that if the Court finds that the Defendant's common law duty has been preempted, the preemptive effect of the federal acts is unconstitutional. Plaintiff argues the federal acts provide no right of redress to persons, such as Plaintiff, who are the victims of the negligence of railroads. She states this blanket eradication of the right of redress is violative of the equal protection and due process clauses of the Constitutions of the United States and New Mexico. Plaintiff states that if it is the sole responsibility of the New Mexico State Highway Department to erect appropriate warning devices at railroad crossings, then the sole remedy against the State falls under the New Mexico Tort Claims Act. The Plaintiff further argues that it is unlikely that there is any remedy to be had against the State because there is no waiver of sovereign immunity in this situation. Finally, the Plaintiff argues

the application of the preemption doctrine in this case would effectively deprive this Plaintiff of any remedy because of the expiration of the statute of limitations against both the federal and state governments for negligent acts.

The Court agrees with Defendant's response to Plaintiff's arguments. Plaintiff has not been denied access to the courts or a right of recovery. First, the issue of whether Defendant negligently operated the train remains in this case regardless of the Court's finding on the preemption issue. Second, the New Mexico Tort Claims Act does not explicitly retain sovereign immunity for claims in the nature of those being made in the present case. The Act does not specifically address a claim for liability based on the state's negligence in failing to properly prioritize the installation of additional warning devices at railroad-highway crossings. From the Court's cursory look at this issue, it appears that the State of New Mexico would probably not enjoy sovereign immunity for these claims.[5] Finally, the fact that the statute of limitations for a claim against the state or the responsible agency may have passed is not sufficient reason to hold preemption unconstitutional.

Finally, the Plaintiff argues that since this is a matter of first impression in the Tenth Circuit, judicial economy dictates denial of the motion. The Court does not agree with Plaintiff's contention. Judicial economy dictates that if the motion is proper, that is, if it meets the requirements of Rule 56, that it be granted. As the Defendant states, Rule 56 contemplates motions such as the present one as a means of streamlining trials.

Therefore, for the above reasons, Defendant's Motion for Partial Summary Judgment with respect to the Plaintiff's claims that Defendant had a duty to install addi-

5. Two cases are cited in the New Mexico Statutes Annotated that would seem to support a waiver of sovereign immunity in this particular situation. First, in *Blackburn v. State*, 98 N.M. 34, 644 P.2d 548 (Ct.App.1982) the Court held where the Plaintiff's allegations, in large part, concern the placement of signals and signs, the State of New Mexico does not enjoy immunity

for such decisions. Second, in *Grano v. Roadrunner Trucking, Inc.*, 99 N.M. 227, 656 P.2d 890 (Ct.App.1982), *cert. denied*, 99 N.M. 358, 658 P.2d 433 (1983) the Court held that the absence of traffic controls is a condition of a highway and is, therefore, the subject of maintenance, and the state is not immune from liability.

tional warning devices at the railroad-highway crossing at issue in this case will be granted.

## II. Plaintiff's Motion in Limine Regarding Seat Belt Defense

■ The Plaintiff requests that the Court exclude any evidence, argument, or inference to be adduced by the Defendant as to the alleged failure by the Plaintiff's Decedent to use a seat belt, and the consequences flowing therefrom. Defendant argues that N.M.Stat.Ann. § 66–7–373 B. (Supp.1990) does not prohibit the jury from apportioning fault and damages as a consequence of Armijo's failure to use a seat belt and if it does, then the statute is unconstitutional as a violation of the separation of powers doctrine and the equal protection requirements of the United States and New Mexico Constitutions.

New Mexico law is clear on this issue. Section 66–7–373 B. (Supp.1990) states:

Failure to be secured by a child passenger restraint device or by a safety belt as required by the Safety Belt Use Act [66–7–370 to 66–7–373 NMSA 1978] shall not in *any instance* constitute fault or negligence *and* shall not limit or apportion damages (emphasis added).

The words of the statute clearly and unambiguously prohibit consideration of the violation of the Act as constituting negligence or negligence *per se,* as well as using evidence of the failure to wear a seat belt to limit or apportion damages.

The Legislature was fully aware of the "seat belt defense" when it enacted this statute. The New Mexico Supreme Court had just recently overruled the "seat belt defense" created by the Court of Appeals in *Thomas v. Henson,* 102 N.M. 417, 696 P.2d 1010 (Ct.App.1984), *aff'd in part and rev'd in part,* 102 N.M. 326, 327, 695 P.2d 476 (1985), saying, "we believe that the creation of a 'seat belt defense' is a matter for the Legislature, not for the judiciary." This decision was handed down during the 37th Legislature which is the legislature that passed the "Safety Belt Use Act." Furthermore, an earlier draft of § 66–7–373 B. provided for admissibility of this type of evidence,[6] however, the bill which was enacted did not. Therefore, it is clear that the legislature made a conscious choice to preclude evidence of the failure to wear a seat belt to limit or apportion damages. The legislature undoubtedly concluded that seat belt use was desirable, and that although the enactment of a law providing for small fines would encourage people to wear seat belts, an injured plaintiff should nevertheless not be denied recovery when involved in a collision with a negligent tortfeasor.

■ In addition, the Court finds that Defendant's constitutional challenges to this statute are without merit. First, the Court notes that legislative acts are presumptively valid and will not be declared invalid unless the court is clearly satisfied that the legislature went outside the constitution in enacting them. *Richardson v. Carnegie Library Restaurant, Inc.,* 107 N.M. 688, 693, 763 P.2d 1153 (1988).

■ With regard to Defendant's separation of powers argument, the Court finds that § 66–7–373 B. is not, as the Defendant contends, a legislative enactment of a rule of evidence, but rather is the enactment of a substantive state policy. It is true as Defendant states that the New Mexico Constitution reposes the inherent power to regulate all pleading, practice and procedure affecting the judicial branch exclusively in the Supreme Court. *Miller & Associates, Ltd. v. Rainwater,* 102 N.M. 170, 171–172, 692 P.2d 1319 (1985). However, it is also true that the Courts should

---

**6.** The earlier draft of § 66–7–373 B. which was rejected for the present provision states:

B. Evidence of a violation of Subsection A of Section 3 of the Safety Belt Use Act shall be admissible concerning mitigation of damages, apportionment of damages or comparative fault, with respect to any person who is involved in an accident while violating Subsec-

tion A of Section 3 of the Safety Belt Use Act and who seeks in any subsequent litigation to recover damages for injuries resulting from the accident. Such evidence may also be admissible on other issues as determined by the court.

Senate Bill 111, 37th Legislature, 1st Session (1985), p. 2.

not invalidate substantive policy choices made by the legislature under the constitutional exercise of its police powers. *Southwest Community Health Services v. Smith,* 107 N.M. 196, 199, 755 P.2d 40 (1988). The Court finds it is clearly within the power of the legislature to determine whether or not to impose as a matter of State policy an obligation on its citizens to wear a seat belt and to establish the sanctions for non-conformity with that obligation.

▇▇▇ The Court also finds that this statute does not violate the equal protection provisions of the United States and New Mexico Constitutions. Defendant argues that this statute creates a class of defendants who have the random misfortune of allegedly injuring a plaintiff who fails to exercise ordinary care by not wearing a seat belt where in virtually any other instance of a plaintiff's failure to use ordinary care which leads to or contributes to the plaintiff's injury, evidence of the plaintiff's breach of duty would be considered by the jury in apportioning fault and damages. Defendant argues this classification works an injustice against included defendants by making them pay for damages caused entirely by the plaintiff's failure to exercise due care for his safety by failing to use an available seat belt. The problem with this argument is that a common law duty to wear a seat belt did not exist prior to the enactment of this statute and with the enactment of this statute the legislature specifically declined to make failure to wear a seat belt the basis for negligence or fault. Therefore, the statute does not affect the substantive rights of defendants or plaintiffs. In New Mexico, there never was a "seat belt defense" and there still is not a "seat belt defense."

Alternatively, even if this statute can be construed as creating statutory classifications, the Court finds that the equal protection test to be applied in this situation is the rational basis test because this legisla-

tion concerns social and economic issues and does not infringe on substantial or important rights nor involve sensitive classes.[7] *Richardson,* 107 N.M. at 697–698, 763 P.2d 1153. Applying the rational basis test to this legislation, the Court finds that § 66–7–373 B. is rationally related to a valid legislative purpose, namely, encouragement of seat belt use through a fine system, while preserving the right to compensation for injuries caused by negligent tortfeasors.

Therefore, for the above reasons, the Court will grant Plaintiff's Motion in Limine regarding the seat belt defense. Any evidence regarding Plaintiff's Decedent's failure to use a seat belt and the consequences thereof, will be excluded.

III. Defendant's Motion to Exclude Conclusory Testimony of Plaintiff's Expert that Crossing was Extrahazardous

Defendant requests that Plaintiff's expert, Dr. Baerwald not be allowed to offer any testimony which reflects his conclusion that the characteristics of the crossing were such that the railroad was required, as a matter of law, to install additional signals. Because this Court granted Defendant's Motion for Partial Summary Judgment, Defendant's above request is moot. This Court has found, as a matter of law, that any prior state basis for Plaintiff's claims that Defendant was negligent in failing to provide additional warning devices at the North Gabaldon Road crossing have been preempted by federal law. Thus, the motion will be denied as moot, however, due to the disposition of the partial summary judgment motion, Dr. Baerwald will not be allowed to testify that the railroad, as a matter of law, was required to install additional signals.

Therefore,

IT IS THE ORDER OF THE COURT that Defendant's Motion for Partial Sum-

---

7. Thus far, the only classifications afforded heightened scrutiny under the federal constitution are those based on gender or illegitimacy. The New Mexico Courts have also subjected legislatively created "damage caps" to intermediate scrutiny. *Trujillo v. City of Albuquerque,* 110 N.M. 621, 798 P.2d 571 (1990).

**1536**

mary Judgment should be, and hereby is, GRANTED.

IT IS FURTHER ORDERED that Plaintiff's Motion in Limine Regarding Seat Belt Defense should be, and hereby is, GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion to Exclude Conclusory Testimony of Plaintiff's Expert that Crossing was Extrahazardous should be, and hereby is, DENIED as moot.